T.C. Memo. 2004-55


UNITED STATES TAX COURT


JERE J. AND PAULETTE M. SOLVIE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 9525-98.                    Filed March 9, 2004.


<u>Garry A. Pearson</u>, <u>Jon J. Jensen</u>, and <u>Alexander F. Reichert</u>,
for petitioners.

<u>Blaine C. Holiday</u>, for respondent.



MEMORANDUM FINDINGS OF FACT AND OPINION


CHIECHI, <u>Judge</u>:  Respondent determined deficiencies of
$3,248, $3,577, and $5,817 in petitioners' Federal income tax
(tax) for 1993, 1994, and 1995, respectively.

We must decide[1] whether certain amounts (reduced by the deductions attributable to such amounts) that petitioners received during 1995 and that they characterized as rent are subject to self-employment tax under section 1402(a)(1).[2] We hold that they are.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found except as discussed below.

At the time petitioners filed the petition in this case, they resided in Hancock, Minnesota.

In 1968, Jere J. Solvie (Mr. Solvie) began farming. In 1970, Paulette M. Solvie (Ms. Solvie) began farming with Mr. Solvie. Prior to 1991, petitioners farmed 928 acres of land, 415 acres of which they owned. Third parties owned the remaining 513 acres.[3]

---

[1]In addition to the issue that we address herein, there is another determination in the notice of deficiency (notice) for 1995 that is computational in that its resolution flows automatically from our resolution of that issue.

[2]All section references are to the Internal Revenue Code in effect for 1995. All Rule references are to the Tax Court Rules of Practice and Procedure.

[3]The parties stipulated that petitioners farmed 928 acres of land, 415 acres of which they owned and 531 acres of which third parties owned. That stipulation insofar as it pertains to the number of acres that third parties owned is clearly contrary to the record in the instant case, and we shall disregard that stipulation to that extent. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989). On brief, respondent acknowl-
(continued...)

Prior to 1991, Mr. Solvie participated in the management of, and in all phases of, crop production and animal production by performing, inter alia, the following farm-related activities in the production of agricultural commodities (i.e., hogs): Loading of the hogs; washing the facilities; checking the feed lines and water levels; refilling the feed lines when necessary; and observing hogs for disease. Prior to 1991, Ms. Solvie performed the following farm-related activities in the production of agricultural commodities: Entering data into the bookkeeping system; accounting; conferring with accountants about bookkeeping and return preparation; picking up orders and spare parts; and running errands. Prior to 1991, the farming operation had the capacity to process 1,000 head of hogs.

In December 1991, petitioners formed JJ & P Farms, Inc. Petitioners each owned 50 percent of the stock of JJ & P Farms, Inc., and they comprised the board of directors (board) of that company. At all relevant times, JJ & P Farms, Inc., engaged in the farming business, specifically raising hogs for the production of pork. During 1993, 1994, and 1995, JJ & P Farms, Inc., farmed the same 928 acres of land that petitioners had farmed prior to 1991, 415 acres of which petitioners owned. Third

---

[3](...continued)
edges that that stipulation is not accurate and that third parties owned 513 acres.

parties owned the remaining 513 acres.[4]

After the formation of JJ & P Farms, Inc., that company hired Mr. Solvie and Ms. Solvie pursuant to an oral arrangement (oral employment arrangement)[5] under which Mr. Solvie was to serve as its chief executive officer (CEO), its chief financial officer (CFO), and a member of its board and Ms. Solvie was to serve as a member of its board. Under that arrangement, Mr. Solvie and Ms. Solvie were to perform in their respective capacities the same farm-related activities in the production of agricultural commodities that they had been performing prior to 1991 (petitioners' farm-related activities). Pursuant to the oral employment arrangement, at all relevant times, including during 1993, 1994, and 1995, Mr. Solvie,[6] as CEO, CFO, and a board member, and Ms. Solvie,[7] as a board member, performed those activities. After petitioners incorporated JJ & P, Farms, Inc., in 1991 and before petitioners built an 800-head capacity hog barn in 1995 (discussed below), the farming operation had the capacity to process 1,000 head of hogs.

---

[4]See supra note 3.

[5]During 1993, 1994, and 1995, petitioners had no written employment agreement with JJ & P Farms, Inc.

[6]At all relevant times, Mr. Solvie spent 100 percent of his time working for JJ & P Farms, Inc.

[7]At all relevant times, Ms. Solvie spent virtually 100 percent of her time working for JJ & P Farms, Inc.

During 1993, 1994, and 1995, JJ & P Farms, Inc., paid wages to petitioners in exchange for petitioners' farm-related activities in the production of agricultural commodities. During 1995, the wages that that company paid to petitioners for such farm-related activities were calculated without regard to such activities that petitioners performed with respect to processing hogs through the 800-head capacity hog barn that petitioners built in 1995.

During 1993 and 1994, petitioners leased to JJ & P Farms, Inc., pursuant to an oral arrangement (oral rental arrangement) farmland,[8] including existing buildings on that land (petitioners' farmland), and certain personal property (petitioners' personal property) that they owned.[9] Pursuant to the oral rental arrangement, during each of the years 1993 and 1994, JJ & P Farms, Inc., was required to, and did, pay to petitioners rent of $29,400 for petitioners' farmland, exclusive of existing buildings on that land, and rent of $21,000 for the buildings on that

---

[8]JJ & P Farms, Inc., also leased certain other farmland from third-party landlords pursuant to oral rental arrangements with those third-party landlords.

[9]During 1993 and 1994, petitioners had no written rental agreement with JJ & P Farms, Inc., with respect to the lease of petitioners' farmland and petitioners' personal property.

land,[10] or total rent of $50,400.[11]

In 1995, petitioners built an 800-head capacity hog barn (petitioners' 800-head capacity hog barn) on petitioners' farmland. During that year, petitioners and JJ & P Farms, Inc., orally modified the oral rental arrangement (modified oral rental arrangement) to reflect that, after the completion of that barn, petitioners were leasing to JJ & P Farms, Inc., petitioners' farmland,[12] including petitioners' 800-head capacity hog barn located on that land, as well as petitioners' personal property.[13] Pursuant to the modified oral rental arrangement, during 1995 JJ & P, Farms, Inc., was required to, and did, pay to petitioners (1) for petitioners' farmland and petitioners'

[10]It is not clear from the record whether in 1993 and 1994 the rent for petitioners' farmland, exclusive of existing buildings on that land (i.e., $29,400) or the rent for the buildings (i.e., $21,000) on that land included rent for petitioners' personal property.

[11]As discussed below, petitioners reported in their 1993 tax return $52,050 in rent received from the lease of petitioners' farmland and petitioners' personal property. The record does not disclose the reason for the discrepancy between the total amount of rent that petitioners received during 1993 from such lease (i.e., $50,400) and the total amount of rent (i.e., $52,050) that petitioners reported in their 1993 tax return.

[12]For convenience, unless otherwise indicated, we shall hereinafter refer to petitioners' farmland, exclusive of petitioners' 800-head capacity hog barn located on that land, as petitioners' farmland.

[13]During 1995, petitioners had no written rental agreement with JJ & P Farms, Inc., with respect to the lease of petitioners' farmland, including petitioners' 800-head capacity hog barn located on that land, and petitioners' personal property.

personal property the same annual rent that that company paid to them in each of the years 1993 and 1994 (i.e., $29,400 for petitioners' farmland, exclusive of existing buildings on that land, and $21,000 for the buildings on that land) and (2) for petitioners' 800-head capacity hog barn $21 per head, per rotation of hogs that petitioners processed through that barn. Pursuant to that modified rental arrangement, the rent that that company was required to, and did, pay to petitioners during 1995 with respect to petitioners' 800-head capacity hog barn depended on the number of hogs that petitioners processed through that barn. During 1995, as a condition to JJ & P Farms, Inc.'s being obligated pursuant to the modified oral rental arrangement to pay rent to petitioners for petitioners' 800-head capacity hog barn, petitioners were obligated or compelled to perform petitioners' farm-related activities in the production by that company of agricultural commodities by processing hogs through that barn.[14] If during 1995 petitioners had not performed any of petitioners' farm-related activities in the production by JJ & P Farms, Inc., of agricultural commodities with respect to petitioners' 800-head capacity hog barn and therefore did not process any hogs through

_____

[14]If during 1995 petitioners became sick or incapacitated or otherwise were unable to perform for JJ & P Farms, Inc., petitioners' farm-related activities in the production of agricultural commodities by processing hogs through petitioners' 800-head capacity hog barn, that company was not obligated pursuant to the modified oral rental arrangement to pay rent to them for petitioners' 800-head capacity hog barn.

that barn, under the modified oral rental arrangement they would not have received any rent from that company with respect to that barn. To the extent that during 1995 petitioners performed such activities by processing hogs through petitioners' 800-head capacity hog barn, they would have received from JJ & P Farms, Inc., with respect to that barn $21 per head, per rotation of hogs processed through that barn. During 1995, petitioners processed approximately three rotations of hogs through petitioners' 800-head capacity hog barn as a result of petitioners' farm-related activities, and consequently petitioners received $44,500 from JJ & P Farms, Inc., with respect to that barn.

Petitioners jointly filed Form 1040, U.S. Individual Income Tax Return, for each of their taxable years 1993 (petitioners' 1993 return), 1994 (petitioners' 1994 return), and 1995 (petitioners' 1995 return). In petitioners' 1993 return, petitioners reported that Mr. Solvie received $18,423.62[15] of wages from JJ & P Farms, Inc. In that return, petitioners reported that Ms. Solvie received $80 of "Wages, salaries, tips, etc." from "MORRIS PUBLIC SCHOOLS", $24 of "Wages, salaries, tips, etc." from "IND.

[15]The parties stipulated that petitioners reported in petitioners' 1993 return that Mr. Solvie received $18,432.62 of wages from JJ & P, Farms, Inc. That stipulation is clearly contrary to petitioners' 1993 return. That return shows that petitioners reported that for 1993 Mr. Solvie received $18,423.62 of wages from JJ & P Farms, Inc. We shall disregard the parties' stipulation regarding the amount of wages that petitioners reported in petitioners' 1993 return Mr. Solvie received from JJ & P Farms, Inc. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. at 195.

SCHOOL DIST. # 611", and $13,122.38[16] of wages from JJ & P Farms, Inc.  In Schedule E, Supplemental Income and Loss (Schedule E), included as part of petitioners' 1993 return, petitioners reported $52,050 in rent received from the rental of petitioners' farmland and petitioners' personal property (1993 claimed rent), $27,212 in expenses, and $24,838 in total rental real estate income.

In petitioners' 1994 return, petitioners reported that Mr. Solvie and Ms. Solvie received $16,356.29 and $5,808.86,[17] re-

---

[16]The parties stipulated that petitioners reported in petitioners' 1993 return that Ms. Solvie received $13,122.21 of wages from JJ & P, Farms, Inc.  That stipulation is clearly contrary to petitioners' 1993 return.  That return shows that petitioners reported that for 1993 they received a total of $31,650 of "Wages, salaries, tips, etc.", $18,423.62 of which Mr. Solvie reported as wages from JJ & P Farms, Inc., and $104 of which Ms. Solvie reported as wages from sources other than JJ & P Farms, Inc.  The difference between (1) the total of the wages (i.e., $31,650) reported from all sources and (2) the total of the wages (i.e., $18,527.62) that Mr. Solvie reported from JJ & P Farms, Inc., (i.e., $18,423.62) and the total of the wages that Ms. Solvie reported from sources other than that company (i.e., $104) is $13,122.38.  We shall disregard the parties' stipulation regarding the amount of wages that petitioners reported in petitioners' 1993 return Ms. Solvie received from JJ & P Farms, Inc.  See Cal-Maine Foods, Inc. v. Commissioner, supra.

[17]The parties stipulated that petitioners reported in petitioners' 1994 return that Ms. Solvie received $5,808 of wages from JJ & P, Farms, Inc.  Petitioners' 1994 return shows that petitioners reported that for 1994 Ms. Solvie received $5,808.86 of wages from JJ & P Farms, Inc.  The parties erroneously stipulated down to the nearest dollar instead of up to the nearest dollar.  We shall disregard the parties' stipulation regarding the amount of wages that petitioners reported in petitioners' 1994 return Ms. Solvie received from JJ & P Farms, Inc.  See Cal-Maine Foods, Inc. v. Commissioner, supra.

spectively, of wages from JJ & P Farms, Inc.  In Schedule E included as part of petitioners' 1994 return, petitioners reported $50,400 in rent received from the rental of petitioners' farmland and petitioners' personal property (1994 claimed rent), $23,015 in expenses, and $27,385 in total rental real estate income.

In petitioners' 1995 return, petitioners reported that Mr. Solvie received $17,439 of wages from JJ & P Farms, Inc.  In that return, petitioners reported that Ms. Solvie received $95 of "Wages, salaries, tips, etc." from "MORRIS PUBLIC SCHOOLS" and $3,410 of wages from JJ & P Farms, Inc.  In Schedule E included as part of petitioners' 1995 return, petitioners reported a total of $94,900 in rent received from the rental of petitioners' farmland, including petitioners' 800-head capacity hog barn located on that land, as well as petitioners' personal property (1995 total claimed rent), $50,384 in expenses, and $44,516 in total rental real estate income.  Of the $94,900 of 1995 total claimed rent that petitioners reported in petitioners' 1995 return, $50,400 was attributable to petitioners' farmland and petitioners' personal property (1995 claimed rent for petitioners' farmland and petitioners' personal property) and $44,500 was attributable to petitioners' 800-head capacity hog barn (1995 claimed rent for petitioners' 800-head capacity hog barn).

The 1993 claimed rent and the 1994 claimed rent that peti-

tioners received from JJ & P Farms, Inc., pursuant to the oral rental arrangement and the 1995 claimed rent for petitioners' farmland and petitioners' personal property that petitioners received from that company pursuant to the modified oral rental arrangement represented fair market rents.

JJ & P Farms, Inc., filed Form 1120, U.S. Corporation Income Tax Return, for its taxable year 1995 (JJ & P Farms, Inc.'s 1995 return). In JJ & P Farms, Inc.'s 1995 return, JJ & P Farms, Inc., reported that it paid $17,439 of compensation to Mr. Solvie as an officer of that company and $3,410 of compensation to Ms. Solvie as an officer. In that return, JJ & P Farms, Inc., reported that it paid $6,989 of salaries and wages, although it did not identify in that return the person or persons to whom it paid those wages. In JJ & P Farms, Inc.'s 1995 return, JJ & P Farms, Inc., reported that it paid $142,634 in rent, although it did not specify in that return the amount of such rent that it paid to petitioners during its taxable year 1995.

On March 20, 1998, respondent issued a notice to petitioners with respect to their taxable years 1993, 1994, and 1995. In that notice, respondent determined that the 1993 claimed rent, the 1994 claimed rent, and the 1995 total claimed rent, reduced by the deductions attributable to such respective rents, are subject to self-employment tax because they constitute net earnings from self-employment under section 1402(a)(1).

OPINION

Petitioners bear the burden of proving that the determinations in the notice that remain at issue are erroneous.[18]  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Respondent no longer maintains, as respondent did in the notice, that the 1993 claimed rent, the 1994 claimed rent, and the 1995 claimed rent for petitioners' farmland and petitioners' personal property that petitioners received from JJ & P Farms, Inc., are subject to self-employment tax.  The only dispute remaining between the parties that we must resolve is whether the 1995 claimed rent for petitioners' 800-head capacity hog barn, reduced by the deductions attributable to such rent, is subject to self-employment tax because it constitutes net earnings from self-employment under section 1402(a)(1).

As applicable here, section 1402(a)(l) defines the term "net earnings from self-employment" to mean

> the gross income derived by an individual from any
> trade or business carried on by such individual, less
> the deductions allowed by this subtitle which are
> attributable to such trade or business * * * except
> that in computing such gross income and deductions
> * * *--
>
> (1) there shall be excluded rentals from real

---

[18]Sec. 7491(a) is not applicable in the instant case.  That is because respondent issued the notice to petitioners on Mar. 20, 1998, and a fortiori the examination of the years involved here would have commenced before July 23, 1998.  See Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727.

estate and from personal property leased with the real estate * * * together with the deductions attributable thereto * * * except that the preceding provisions of this paragraph shall not apply to any income derived by the owner or tenant of land if (A) such income is derived under an arrangement, between the owner or tenant and another individual, which provides that such other individual shall produce agricultural * * * commodities * * * on such land, and that there shall be material participation by the owner or tenant * * * in the production or the management of the production of such agricultural * * * commodities, and (B) there is material participation by the owner or tenant * * * with respect to any such agricultural * * * commodity;

(The regulations under section 1402(a)(1), and we, refer to the farm rental income that is included under that section in the definition of net earnings from self-employment as includible farm rental income.)

The regulations under section 1402(a)(1) elaborate on the meaning of includible farm rental income, as follows:

(b) Special rule for "includible farm rental income"--(1) In general. * * * there shall be included in determining net earnings from self-employment for taxable years ending after 1955 any income derived by an owner or tenant of land, if the following requirements are met with respect to such income:

(i) The income is derived under an arrangement between the owner or tenant of land and another person which provides that such other person shall produce agricultural * * * commodities on such land, and that there shall be material participation by the owner or tenant in the production or the management of the production of such agricultural * * * commodities; and

(ii) There is material participation by the owner or tenant with respect to any such agricultural * * * commodity.

Income so derived shall be referred to in this section as "includible farm rental income".

(2) <u>Requirement that income be derived under an arrangement</u>. In order for rental income received by an owner or tenant of land to be treated as includible farm rental income, such income must be derived pursuant to a sharefarming or other rental arrangement which contemplates material participation by the owner or tenant in the production or management of production of agricultural * * * commodities.

(3) <u>Nature of arrangement</u>. (i) The arrangement between the owner or tenant and the person referred to in subparagraph (1) of this paragraph may be either oral or written. The arrangement must impose upon such other person the obligation to produce one or more agricultural * * * commodities * * * on the land of the owner or tenant. In addition, it must be within the contemplation of the parties that the owner or tenant will participate in the production or the management of the production of the agricultural * * * commodities required to be produced by the other person under such arrangement to an extent which is material with respect either to the production or to the management of production of such commodities or is material with respect to the production and management of production when the total required participation in connection with both is considered.

*       *       *       *       *       *       *

(4) <u>Actual participation</u>. In order for the rental income received by the owner or tenant of land to be treated as includible farm rental income, not only must it be derived pursuant to the arrangement described in subparagraph (1) of this paragraph, but also the owner or tenant must actually participate to a material degree in the production or in the management of the production of any of the commodities required to be produced under the arrangement, or he must actually participate in both the production and the management of the production to an extent that his participation in the one when combined with his participation in the other will be considered participation to a material degree. * * *

Sec. 1.1402(a)-4(b), Income Tax Regs.

The parties agree that during 1995 petitioners were to, and did, participate materially within the meaning of section 1402(a)(1) in the production by JJ & P Farms, Inc., of agricultural commodities by performing petitioners' farm-related activities with respect to, inter alia, processing hogs through petitioners' 800-head capacity hog barn.  They disagree over whether the 1995 claimed rent for that barn was derived under an arrangement within the meaning of section 1402(a)(1)(A) and section 1.1402(a)-4(b)(2), Income Tax Regs., between petitioners and JJ & P Farms, Inc., which provided or contemplated, inter alia, that JJ & P Farms, Inc., was to produce agricultural commodities in that barn and that petitioners were to participate materially in the production of such commodities by processing hogs through that barn.

It is petitioners' position that the 1995 claimed rent for petitioners' 800-head capacity hog barn was not derived under such an arrangement and that consequently such claimed rent, reduced by the deductions attributable to such rent, is not subject to self-employment tax because it does not constitute includible farm rental income under section 1402(a)(1) and the regulations thereunder.  In support of their position, petitioners rely on the opinion of the Court of Appeals for the Eighth Circuit in McNamara v. Commissioner, 236 F.3d 410 (8th Cir. 2000), revg. and remanding Bot v. Commissioner, T.C. Memo. 1999-

256, <u>Hennen v. Commissioner</u>, T.C. Memo. 1999-306, and <u>McNamara v. Commissioner</u>, T.C. Memo. 1999-333.[19]  In reliance on McNamara II, petitioners contend that

> the Solvies are receiving fair market value rental payments.  The Solvies are also receiving other compensation for the services they provide to the corporation.  The simple fact that they are participating in the farming operation does not establish the required nexus between the rental payments and the material participation necessary to trigger the inclusion of the payments within the definition of self-employment income.  To the contrary, adoption of the Commissioner's position would compel the conclusion that the Solvies, as landlords, are required to rent property to the corporation at below fair market value and below the rates paid to third parties.  The "missing link" in the Commissioner's argument is the same as in the <u>McNamara</u> case:  the corporation's obligation to make the rental payments is separate and distinct from the taxpayers' participation in the farming operation.

Respondent counters that McNamara II does not require the result advocated by petitioners in the instant case.  Respondent argues that

> The Eighth Circuit in <u>McNamara</u> * * * created a judicial exception for fair rental value when the landlord has two independent arrangements with the lessee for rent and wages and there is no nexus between the two arrangements.

> Petitioners fail to meet the Eighth Circuit's standard because they failed to establish the fair rental value of the new facilities used by the corporation in 1995 or that a separate employment agreement existed for petitioners' services related to the additional activities carried on in the new facilities.

---

[19]We shall refer to our respective opinions that the Court of Appeals for the Eighth Circuit reversed and remanded as Bot I, Hennen I, and McNamara I and to the opinion of that Court as McNamara II.

Petitioners' classification of all funds from the corporation for use of the new facilities in 1995 as rent, and none as wages, demonstrates that there were not independent arrangements with respect to real estate rentals and compensation for services. More-over, the transaction does not pass muster given the strict scrutiny apple [sic] to such related-party transactions, and given that exceptions from self-employment tax under § 1402(a)(1) are narrowly con-strued.

Bot I, Hennen I, and McNamara I involved taxpayers who, pursuant to certain agreements or arrangements, were to, and did, participate materially in the production of agricultural commodities involved in those respective cases. In Bot I and Hennen I, the taxpayer-owners of the farmland in question entered into (1) employment agreements or arrangements with their respective taxpayer-spouses and (2) rental agreements or arrangements with those spouses. In McNamara I, the taxpayer-owners of the farm-land in question entered into (1) an employment agreement or arrangement with their wholly owned corporation and (2) a rental agreement or arrangement with that corporation.

In Bot I and Hennen I, the taxpayer-owners of the farmland in question contended that the respective rental agreements or arrangements involved in those cases did not require their material participation in the production of the agricultural commodities in question. We found that the respective taxpayer-owners in Bot I and Hennen I played a material role in the production of such commodities under an agreement or arrangement with their taxpayer-spouses. We further found in Bot I and

Hennen I that the income received from the rental of the respective taxpayer-owners' farmland in question was derived under an arrangement between the taxpayer-owners of the farmland and their taxpayer-spouses, which provided that those spouses were to produce agricultural commodities on that land and that the taxpayer-owners were to participate materially in the production of such commodities. We held in Bot I and Hennen I that the rents at issue in those cases, reduced by the deductions attributable to such respective rents, were subject to self-employment tax because they constituted includible farm rental income under section 1402(a)(1).

In McNamara I, the taxpayer-owners of the farmland in question contended that the rental agreement or arrangement involved in that case did not require their material participation in the production of the agricultural commodities in question. We found that the taxpayer-owners played a material role in production of such commodities under an agreement or arrangement with their wholly owned corporation. We further found in McNamara I that the income received from the rental of the taxpayers' farmland in question was derived under an arrangement between the taxpayer-owners and their wholly owned corporation, which provided that that corporation was to produce agricultural commodities on that land and that the taxpayer-owners were to participate materially in the production of such commodities. We

held in McNamara I that the rent at issue in that case, reduced by the deductions attributable to such rent, was subject to self-employment tax because it constituted includible farm rental income under section 1402(a)(1).

The taxpayers in Bot I, Hennen I, and McNamara I appealed our respective decisions in those cases to the Court of Appeals for the Eighth Circuit. That Court decided those appeals in one opinion in McNamara II. In McNamara II, the Court of Appeals for the Eighth Circuit concluded:

> we cannot say the Tax Court clearly erred in conclud-
> ing, as a factual matter, that Mrs. McNamara, Mrs. Bot,
> and Mrs. Hennen were required--by their respective
> employment agreements or by more informal "arrange-
> ments"--to materially participate in agricultural
> production and management, and that all three did in
> fact materially participate in those activities. See
> Treas. Reg. § 1.1402(a)-4(b) (as amended in 1980).
>
> More promising, however, is taxpayers' argument
> that the lessor-lessee relationships should stand on
> their own apart from the employer-employee relation-
> ships. To this end, taxpayers insist that the rents in
> question were consistent with market rates for agricul-
> tural land. In fact, the transcripts of each trial
> contain uncontradicted testimony that the rents were at
> or slightly below fair market value. * * * The Tax
> Court's decision, however, contains no factual finding
> in this regard. Moreover, the Commissioner apparently
> did not pursue the issue at trial because, as it con-
> tended at oral argument, the amount of the rent is
> irrelevant. We disagree.
>
> What is missing from both the Commissioner's and
> the Tax Court's analyses is any mention of a nexus
> between the rents received by Taxpayers and the "ar-
> rangement" that requires the landlords' material par-
> ticipation. We believe this omission overlooks §
> 1402(a)(1)'s requirement that rents be "derived under"
> such an arrangement. That is to say, the mere exis-

tence of an arrangement requiring and resulting in material participation in agricultural production does not automatically transform rents received by the landowner into self-employment income. It is only where the payment of those rents comprise part of such an arrangement that such rents can be said to derive from the arrangement.

Rents that are consistent with market rates very strongly suggest that the rental arrangement stands on its own as an independent transaction and cannot be said to be part of an "arrangement" for participation in agricultural production. Although the Commissioner is correct that, unlike other provisions in the Code, § 1402(a)(1) contains no explicit safe-harbor provision for fair market value transactions, we conclude that this is the practical effect of the "derived under" language.

McNamara v. Commissioner, 236 F.3d at 412-413.

The Court of Appeals for the Eighth Circuit remanded Bot I, Hennen I, and McNamara I in order to provide the Commissioner of Internal Revenue the opportunity to show that a connection existed between the respective rents and the respective employment agreements or arrangements involved in those cases. On remand, the respective parties in Bot I, Hennen I, and McNamara I declined our invitation to conduct additional trials. As a result, we found that the rent at issue in each of those cases was at or below market rates and decided that no deficiency in self-employment tax existed in any of those cases.

In Golsen v. Commissioner, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), we concluded that we would follow a Court of Appeals opinion which is squarely in point where appeal from our decision would lie to that Court of Appeals and

to that court alone.  In the instant case, during 1995 petitioners had two arrangements with JJ & P Farms, Inc.:  (1) An oral employment arrangement under which petitioners were to, and did, participate materially in the production by JJ & P Farms, Inc., of agricultural commodities by performing petitioners' farm-related activities with respect to, inter alia, processing hogs through petitioners' 800-head capacity hog barn; and (2) a modified oral rental arrangement under which petitioners leased to JJ & P Farms, Inc., inter alia, that barn.  There were two identical types of arrangements involved in McNamara II.  The issue presented here is whether the 1995 claimed rent at issue, reduced by the deductions attributable to such rent, is subject to self-employment tax because it constitutes includible farm rental income under section 1402(a)(1).  That was the identical issue presented in McNamara II.  We conclude that McNamara II is squarely in point.  Moreover, the court to which an appeal in this case would normally lie is the Court of Appeals for the Eighth Circuit.  We shall follow McNamara II.  Golsen v. Commissioner, supra.

As required by McNamara II, we must determine whether there was a nexus between (1) the 1995 claimed rent for petitioners' 800-head capacity hog barn that petitioners received pursuant to the modified oral rental arrangement and (2) the oral employment arrangement under which petitioners were to, and did, participate

materially in the production by JJ & P Farms, Inc., of agricultural commodities by performing petitioners' farm-related activities with respect to, inter alia, processing hogs through that barn.[20]  As we understand their position, petitioners contend (1) that the 1995 claimed rent for petitioners' 800-head capacity hog barn represented fair market rent and (2) that petitioners received compensation, which did not include such rent, for

---

[20]We note that in McNamara I there is no indication that the parties advanced, and the Court did not address, any argument that, because the taxpayer-owners of the farmland in that case materially participated within the meaning of sec. 1402(a)(1) in the production of agricultural commodities as employees of their wholly owned corporation and not in their individual capacities, the analysis under sec. 1402(a)(1) should be different from the analysis in Bot I and Hennen I, where the taxpayer-owners of the farmland involved in those two cases materially participated within the meaning of sec. 1402(a)(1) in the production of agricultural commodities in their individual capacities.  In McNamara II, there is no indication that the taxpayers appealing McNamara I advanced, and the Court of Appeals for the Eighth Circuit did not address, any argument that the analysis under sec. 1402(a)(1) with respect to such taxpayers should be any different from the analysis with respect to the taxpayers appealing Bot I and Hennen I.

In the instant case, neither petitioners nor respondent advances any argument that the analysis under sec. 1402(a)(1) should be different from the analysis in McNamara II because petitioners materially participated within the meaning of sec. 1402(a)(1) in the production by JJ & P Farms, Inc., of agricultural commodities as employees of JJ & P Farms, Inc., and not in their individual capacities.  Indeed, petitioners rely solely on the analysis in McNamara II to support their position in the instant case.  Consequently, we shall not address whether our analysis would be different in the instant case because petitioners materially participated within the meaning of sec. 1402(a)(1) in the production of agricultural commodities by JJ & P Farms, Inc., as employees of JJ & P Farms, Inc., and not in their individual capacities.

petitioners' farm-related activities in the production by JJ & P Farms, Inc., of agricultural commodities with respect to processing hogs through that barn. Consequently, according to petitioners, no nexus existed between (1) the 1995 claimed rent for petitioners' 800-head capacity hog barn that petitioners received pursuant to the modified oral rental arrangement and (2) the oral employment arrangement under which petitioners were to, and did, participate materially in the production by JJ & P Farms, Inc., of agricultural commodities by performing petitioners' farm-related activities with respect to, inter alia, processing hogs through that barn.

We turn to petitioners' contention that the 1995 claimed rent for petitioners' 800-head capacity hog barn represented fair market rent. In support of that contention, petitioners rely on the following testimony of Mr. Solvie in response to the following question by petitioners' counsel on direct examination of Mr. Solvie:[21]

> Q    Okay. The rent that you [acting on behalf of JJ & P Farms, Inc.] paid for the new hog barn, was it above, below, or at fair market value for your area?

> A    About fair market value. Fair market value.

_____

[21]In addition to relying on Mr. Solvie's testimony to support their position that the 1995 claimed rent for petitioners' 800-head capacity hog barn represented fair market rent, petitioners contend that respondent stipulated that that rent represented fair market rent. That contention is wrong. Respondent did not stipulate that that rent represented fair market rent.

We understand the foregoing question by petitioners' counsel to be asking whether the total rent that JJ & P Farms, Inc., paid to petitioners during 1995 with respect to petitioners' 800-head capacity hog barn (i.e., $44,500) was above, below, or at fair market value. However, the rent that that company was required to, and did, pay to petitioners during 1995 with respect to that barn was not $44,500, but was $21 per head, per rotation of hogs that petitioners processed through that barn. There is nothing in the record establishing that $21 per head, per rotation of hogs that petitioners processed through petitioners' 800-head capacity hog barn represented fair market rent for such barn.[22]

---

[22]Assuming arguendo that it were proper for the colloquy between petitioners' counsel and Mr. Solvie to have focused on the total rent that JJ & P Farms, Inc., paid to petitioners during 1995 with respect to petitioners' 800-head capacity hog barn (i.e., $44,500), instead of on the rent of $21 per head, per rotation of hogs that petitioners processed through that barn, we are not persuaded by Mr. Solvie's testimony, which we found to be vague and ambiguous, that such total rent paid represented fair market rent. Mr. Solvie's use of the word "about" as a qualifier to the phrase "fair market value" raises a serious question in our mind as to whether Mr. Solvie was testifying that the total rent that JJ & P Farms, Inc., paid to petitioners during 1995 was below, at, or above fair market rent. Mr. Solvie's repeating the phrase "fair market value" does not clarify but instead compounds the vagueness and ambiguity of his testimony that such total rent paid was "about fair market value." Moreover, we found Mr. Solvie's testimony to be general, vague, ambiguous, self-serving, uncorroborated, and/or internally inconsistent in certain other material respects. For example, the following exchange took place during the cross-examination by respondent's counsel of Mr. Solvie:

> Q    But the rent that you received for the new facility was wholly dependent upon the number of pigs

(continued...)

Assuming arguendo that it were proper for the question posed to Mr. Solvie by petitioners' counsel to have focused on the total rent that JJ & P Farms, Inc., paid to petitioners during 1995 with respect to petitioners' 800-head capacity hog barn (i.e., $44,500) and that Mr. Solvie had clearly and unambiguously testified that such rent paid represented fair market rent, on the instant record we would not rely on such testimony. The record establishes that, after petitioners incorporated JJ & P Farms, Inc., in 1991 and before petitioners built petitioners'

---

[22](...continued)
that went through the barn.

    A     No. Not--yes. I suppose it would.

    Q     And so if the new facility sat empty, you would receive no rent.

    A     No. We were going to get rent whether we were using it or not.

    Q     Well, you leased it to the corporation for $21 per head per rotation. If the corporation put no hogs through that barn, you would receive no rent from the corporation.

    A     No. We were--[the] number of pigs or any-thing were not tied to the corporation. We were going to get money for that, regardless of if the pigs went through or not.

    Q     The parties have stipulated that the lease agreement was $21 per head, per rotation. If there was no pigs that went through and no rotations, how would you get any rent?

    A     I don't know.

We shall not rely on Mr. Solvie's testimony to establish peti-tioners' position in this case.

800-head capacity hog barn in 1995, the farming operation had the capacity to process 1,000 head of hogs. During each of the years 1993, 1994, and 1995, JJ & P Farms, Inc., was required to, and did, pay to petitioners fair market rent of $21,000 for the buildings, exclusive of that barn, located on petitioners' farmland that had the capacity to process 1,000 head of hogs. Although not entirely clear from the record, it appears that, after petitioners built petitioners' 800-head capacity hog barn in 1995, the farming operation of JJ & P Farms, Inc., had the capacity to process not only 1,000 head of hogs in those build-ings but also an additional 800 head of hogs in that barn. We find it difficult to believe that during 1995 buildings, with the capacity to process 1,000 head of hogs, would have generated annual fair market rent of $21,000 while petitioners' 800-head capacity hog barn, with the capacity to process 800 head of hogs and with rent for such barn calculated as $21 per head, per rotation of hogs that petitioners processed through that barn, would have generated annual fair market rent of $44,500--the amount of the 1995 claimed rent for petitioners' 800-head capac-ity hog barn that petitioners received from JJ & P Farms, Inc., during 1995.

In this connection, at the trial in this case in June 2003 Mr. Solvie, apparently in an attempt to justify having received

annual rent for petitioners' 800-head capacity hog barn during 1995 that was more than twice as much as the annual fair market rent that petitioners received during that year for petitioners' other buildings, testified during direct examination as follows in response to the following question by petitioners' counsel:

> Q    Can you tell me a little bit about the environment for construction of hog barns in your area?

> A    It's--in our area, we're--it's--right now, they've been under a building moratorium, because there has been a lot of construction going on, and until the last couple--until probably about the last three years, so people have pigs, and they want to get their pigs into these newer facilities, but they've been unable to build, so people are really scrambling to try and use or rent these facilities that are already existing. You can't get permits anymore to build, so it's kind of--you know, people are really scrambling to get buildings that are already in existence.

We understand the foregoing testimony of Mr. Solvie to be addressing the availability in June 2003 at the time of trial, and not in 1995, of new hog barns situated around the geographic location of petitioners' 800-head capacity hog barn.  We are not persuaded by that testimony that a shortage of new hog barns existed in 1995, which would have resulted in petitioners' having received rent in that year for petitioners' 800-head capacity hog barn (i.e., $44,500) that was over twice the fair market rent that petitioners received in that year for the other buildings on petitioners' farmland (i.e., $21,000).

On the record before us, we find that petitioners have failed to establish that the 1995 claimed rent for petitioners'

800-head capacity hog barn represented fair market rent. Conse-
quently, petitioners' reliance on the following conclusions of
the Court of Appeals for the Eighth Circuit in McNamara II is
misplaced:[23]

> Rents that are consistent with market rates very
> strongly suggest that the rental arrangement stands on
> its own as an independent transaction and cannot be
> said to be part of an "arrangement" for participation
> in agricultural production. Although the Commissioner
> is correct that, unlike other provisions in the Code,
> § 1402(a)(1) contains no explicit safe-harbor provision
> for fair market value transactions, we conclude that
> this is the practical effect of the "derived under"
> language.

McNamara v. Commissioner, 236 F.3d at 413.

We turn now to petitioners' contention that petitioners
received compensation for petitioners' farm-related activities in
the production by JJ & P Farms, Inc., of agricultural commodities
with respect to processing hogs through petitioners' 800-head
capacity hog barn, which did not include the 1995 claimed rent
for such barn. Petitioners do not point to any evidence in
support of that contention. That is because there is none. The
record establishes, indeed Mr. Solvie testified, and we have

---

[23]Having found that petitioners have failed to establish
that the 1995 claimed rent for petitioners' 800-head capacity hog
barn represented fair market rent, we reject petitioners' argu-
ment that

> adoption of the Commissioner's position would compel
> the conclusion that the Solvies, as landlords, are
> required to rent property to the corporation at below
> fair market value and below the rates paid to third
> parties. * * *

found that during 1995 the wages that JJ & P Farms, Inc., paid to petitioners for petitioners' farm-related activities in the production of agricultural commodities were calculated without regard to the activities that petitioners performed with respect to processing hogs through petitioners' 800-head capacity hog barn.

We have rejected the two reasons that petitioners advance in support of their position that there was no nexus between (1) the 1995 claimed rent for petitioners' 800-head capacity hog barn that petitioners received pursuant to the modified oral rental arrangement and (2) the oral employment arrangement under which petitioners were to, and did, participate materially in the production by JJ & P Farms, Inc., of agricultural commodities by performing petitioners' farm-related activities with respect to, inter alia, processing hogs through that barn.  On the record before us, we find no other reason that would support petitioners' position that there was no such nexus.

Pursuant to the modified oral rental arrangement, the rent that JJ & P Farms, Inc., was required to, and did, pay to petitioners during 1995 with respect to petitioners' 800-head capacity hog barn depended on the number of hogs that petitioners processed through that barn.  During 1995, as a condition to JJ & P Farms, Inc.'s, being obligated pursuant to that modified rental arrangement to pay rent to petitioners for that barn, petitioners

were obligated or compelled to perform petitioners' farm-related activities in the production by that company of agricultural commodities by processing hogs through that barn. If during 1995 petitioners had not performed any of petitioners' farm-related activities in the production by JJ & P Farms, Inc., of agricultural commodities with respect to petitioners' 800-head capacity hog barn and therefore did not process any hogs through that barn, under the modified oral rental arrangement they would not have received any rent from that company with respect to that barn. To the extent that during 1995 petitioners performed such activities by processing hogs through petitioners' 800-head capacity hog barn, they would have received from JJ & P Farms, Inc., with respect to that barn $21 per head, per rotation of hogs processed through that barn. During 1995, petitioners processed approximately three rotations of hogs through petitioners' 800-head capacity hog barn as a result of petitioners' farm-related activities, and consequently petitioners received $44,500 from JJ & P Farms, Inc., with respect to that barn, which is the amount of the 1995 claimed rent for petitioners' 800-head capacity hog barn.

Based upon our examination of the entire record in this case, we find that petitioners have failed to establish that during 1995 there was no nexus between (1) the 1995 claimed rent for petitioners' 800-head capacity hog barn that petitioners

received pursuant to the modified oral rental arrangement and (2) the oral employment arrangement under which petitioners were to, and did, participate materially in the production by JJ & P Farms, Inc., of agricultural commodities by performing petitioners' farm-related activities with respect to, inter alia, processing hogs through that barn. On that record, we further find that petitioners have failed to show that the 1995 claimed rent for petitioners' 800-head capacity hog barn was not derived under an arrangement within the meaning of section 1402(a)(1)(A) and section 1.1402(a)-4(b)(2), Income Tax Regs., between petitioners and JJ & P Farms, Inc., which provided or contemplated, inter alia, that that company was to produce agricultural commodities in that barn and that petitioners were to participate materially in the production of such commodities by processing hogs through that barn. On the record before us, we hold that petitioners have failed to establish that the 1995 claimed rent for petitioners' 800-head capacity hog barn, reduced by the deductions attributable to such rent, is not subject to self-employment tax because it does not constitute includible farm rental income and therefore is not net earnings from self-employment under section 1402(a)(1).

We have considered all of the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing and the concessions of respondent,

<u>Decision will be entered</u>

<u>under Rule 155</u>.