149 T.C. No. 12

UNITED STATES TAX COURT

CHARLES D. MARTIN AND LAURA J. MARTIN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15810-13.                        Filed September 27, 2017.

Ps owned a farm, renting a portion of the land to wholly owned
S corporation C. C contracted with unrelated entity S to raise
chickens according to S' exacting specifications. Ps followed S'
specific instructions to build structures designed only to raise S'
chickens. C paid Ps wages for their labor and rent for the use of the
farm and structures. R asserts that the rent is subject to self-
employment tax pursuant to I.R.C. sec. 1402(a)(1).

<u>Held</u>: The facts of the instant case are not materially dis-
tinguishable from the facts of <u>McNamara v. Commissioner</u>, T.C.
Memo. 1999-333, <u>rev'd</u>, 236 F.3d 410 (8th Cir. 2000). The U.S.
Court of Appeals for the Eighth Circuit in <u>McNamara</u> also reversed
<u>Hennen v. Commissioner</u>, T.C. Memo. 1999-306, and <u>Bot v.
Commissioner</u>, T.C. Memo. 1999-256. In the light of the reversals by
the Court of Appeals for the Eighth Circuit, the Court reconsiders its
holdings.

Held, further, Ps established that the rent received was at or below fair market value. R failed to show a sufficient nexus between the rental income and petitioners' obligations to participate in the production or management of the production of agricultural commodities. Therefore, the rent Ps received pursuant to the lease is not includible in their net self-employment income. To the extent McNamara v. Commissioner, T.C. Memo. 1999-333, Hennen v. Commissioner, T.C. Memo. 1999-306, and Bot v. Commissioner, T.C. Memo. 1999-256, are inconsistent with this holding, they are not followed.

Charles D. Martin and Laura J. Martin, pro se.

Lewis A. Booth II, for respondent.

PARIS, Judge: The Internal Revenue Service (IRS or respondent) determined deficiencies in petitioners' 2008 and 2009 Federal income tax of $13,409 and $15,408, respectively. The question presented is whether rent payments petitioners received are subject to self-employment tax under section 1402(a)(1).[1]

_____

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, the exhibits attached thereto, and the exhibit admitted at trial are incorporated by this reference. Petitioners resided in Texas when they timely petitioned this Court. They were married during the years in issue.

Charles Martin holds a degree in agricultural engineering from Texas A&M University. Since July 1999 Mr. and Mrs. Martin have owned a farm consisting of more than 300 acres of land, various agricultural and horticultural structures, and their personal residence. Mrs. Martin performed the farm's bookkeeping; Mr. Martin performed a portion of the physical labor and other management services as necessary.[2]

In late 1999 petitioners began constructing the first of eight poultry houses in which they would raise young chickens designated as broilers.[3] The poultry houses were built in accordance with detailed specifications provided by Sanderson Farms, Inc. (Sanderson Farms)--a Fortune 1000 company and the third

---

[2]During 2000, 2001, and 2010 Mr. Martin spent most of the year away from the farm performing consulting services.

[3]These houses were specifically designed and built to raise broilers. Webster's Third New International Dictionary Unabridged 281 (2002) defines "broiler" as: "a chicken or other bird fit for broiling; esp : a young chicken weighing up to 2 1/2 pounds dressed".

largest poultry producer in the United States. The poultry houses were substantial in size as each offered over 22,000 square feet of usable space. Petitioners also installed specialized equipment for the broilers, including heating and air conditioning, among numerous other improvements. The costs of these improvements to petitioners' farm totaled more than $1.2 million.

In 2000 petitioners entered into a Broiler Production Agreement (BPA) with Sanderson Farms.[4] This 15-year agreement contained extensive instructions and requirements for petitioners, as the "growers" of broilers. In essence, Sanderson Farms would deliver to petitioners a flock of broilers--along with the daily necessary proprietary blend of feed for the birds--and 49 days later, it would return to pick them up. The process would be repeated four or five more times each year.

Over the course of those 49-day cycles, petitioners were responsible for the care of each flock of broilers using good poultry husbandry practices. In carrying out Sanderson Farms' detailed instructions, petitioners were allowed to hire additional laborers or employees. However, petitioners' discretion ended there. Not only did Sanderson Farms retain ownership of the broilers, but it also retained ownership of all feed consumed or unconsumed by the flock. Sanderson Farms

---

[4]Although Mr. Martin performed consulting work away from the farm during 2000, 2001, and 2010, the BPA obligations were fulfilled without exception.

required the broilers to be cared for according to the standards of its proprietary broiler growing program, and its employees checked on the broilers daily throughout the 49-day cycle. This program restricted the diet of the broilers to the proprietary blend of feed delivered to each poultry house and other items necessary for their health and wellbeing; it also required prior notice for any deviation from the flock's engineered diet to be specifically approved by Sanderson Farms.

In 2003 petitioners obtained an agricultural appraisal of their farm. The appraisal not only detailed the value of the land and structures but also analyzed the cost of running the broiler operation as an investment (and not as active participants). On November 19, 2004, petitioners organized C L Farms, Inc. (CL Farms), as an S corporation.[5] Using the appraisal as a guide for the cost of labor and management services and incorporating information gathered from other broiler growers, petitioners entered into oral employee agreements with CL Farms and set their salaries at amounts consistent with those of other growers.[6] Mrs. Martin would provide bookkeeping services to the corporation, and Mr. Martin,

---

[5]The Court takes judicial notice of this date, which is found in the records of the Texas secretary of state. See Fed. R. Evid. 201.

[6]The 2003 appraisal suggests that the cost of labor and management to run petitioners' farm is approximately $52,900 per year.

along with any hired laborers or employees, would provide the requisite labor and management services.

In January 2005 Sanderson Farms approved petitioners' assignment of the remainder of their BPA to CL Farms. Like petitioners' BPA, CL Farms' BPA anticipated relying on employees to meet the requirements of good poultry husbandry and the Sanderson Farms broiler growing program. CL Farms, rather than petitioners, would be responsible as the grower; nothing in the BPA required petitioners to personally perform the duties of grower.[7] Sanderson Farms retained title to the broilers and proprietary feed and--in addition to daily check-ins--was willing and able to take over utility payments or the day-to-day care of a flock if CL Farms failed to perform its duties.

On January 20, 2005, petitioners entered into a five-year lease agreement with CL Farms by which CL Farms would rent from petitioners their farm (excluding their residence, access to the residence, and 10 acres), structures, 176,000 square feet of poultry houses, and equipment.[8] Over the course of the

---

[7]Mr. Martin signed the corporate signature page, personally guaranteeing the growing obligations of CL Farms. Mrs. Martin did not.

[8]CL Farms used approximately 10 acres of land surrounding the broiler houses in conjunction with its BPA. The rest of the farm was actively used for grazing and other cattle-related activity. The amount of revenue generated by this

(continued...)

five-year lease, CL Farms agreed to pay rent of $1.3 million to petitioners.[9] The agreement required CL Farms to remit each rent payment irrespective of whether it had fulfilled its requirements as grower to Sanderson Farms or received sufficient income. This amount represented fair market rent and was consistent with amounts paid by other Sanderson Farm growers for the use of similar premises.

For 2008 and 2009 CL Farms fulfilled its duties under the lease, making all of the necessary rent payments to petitioners, which petitioners reported as rental income, excludable from self-employment income. At no point during the years in issue did petitioners believe that they were--nor were they actually--obligated or compelled to perform farm-related activities as a condition to CL Farms' obligation pursuant to the lease to pay rent to petitioners. For 2008 and 2009 CL Farms also fulfilled its duties as grower to Sanderson Farms; petitioners were similarly not obligated to perform farm-related activities in CL Farms' production of agricultural commodities. Although petitioners materially participated in the broiler production activity, CL Farms consistently hired numerous laborers to

---

[8](...continued)
other activity during the years in issue was not insignificant, representing 11.5% of CL Farms' income for each of the years in issue.

[9]This amount was paid in installments following Sanderson Farms' payment for each grown flock of broilers; it was structured in that way to accommodate CL Farms' operational cashflow requirements.

clean and reset the houses between flocks. CL Farms also hired professional and legal counsel in conjunction with the farm's management. For 2008 and 2009 CL Farms paid for labor, employee benefits, and professional services $77,796 and $86,389, respectively.

Petitioners jointly filed Forms 1040, U.S. Individual Income Tax Return, for 2008 and 2009, reporting rental income from CL Farms of $259,000 and $271,000, respectively. The IRS determined that these amounts were subject to self-employment tax because they constituted net earnings from self-employment under section 1402(a)(1). Petitioners timely sought redetermination of the resulting deficiencies in this Court.

## OPINION

The sole issue in this case is whether the rent payments petitioners received are subject to self-employment tax under sections 1401 and 1402(a)(1) for the years in issue. Section 1401 imposes a tax upon self-employment income; section 1402 provides instructions for calculating the amount. As relevant to this case, section 1402(a) provides:

> SEC. 1402(a). Net Earnings From Self-Employment.--The term "net earnings from self-employment" means the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle * * * except that in computing such gross income and deductions * * *

(1) there shall be excluded rentals from real estate and from personal property leased with the real estate * * * except that the preceding provisions of this paragraph shall not apply to any income derived by the owner or tenant of land if

(A) such income is derived under an arrangement, between the owner or tenant and another individual, which provides that such other individual shall produce agricultural or horticultural commodities (including * * * poultry * * *) on such land and that there shall be material participation by the owner or tenant (as determined without regard to any activities of an agent of such owner or tenant) in the production or management of the production of such agricultural or horticultural commodities, and

(B) there is material participation by the owner or tenant (as determined without regard to any activities of an agent of such owner or tenant) with respect to any such agricultural or horticultural commodity * * *

Respondent contends that the rent payments petitioners received are subject to self-employment tax because, taking into account all the facts and circumstances, there existed an arrangement between petitioners and both CL Farms and Sanderson Farms that required petitioners to materially participate in the production of agricultural commodities on their farm. Conversely, petitioners contend that the rent payments are not subject to self-employment tax for two reasons. First, the rent payments were consistent with market rates, and there was no nexus between the lease and either the BPA or the employment agreements.

Second, their material participation was not required by either CL Farms' BPA or their oral employment agreements with CL Farms.

## I. McNamara v. Commissioner

The parties base their arguments primarily on McNamara v. Commissioner (McNamara I), T.C. Memo. 1999-333, rev'd, 236 F.3d 410 (8th Cir. 2000), where this Court held--in virtually identical circumstances--that rental income from a wholly owned corporation was received pursuant to an arrangement between the parties to produce agricultural commodities on the farm within the meaning of section 1402(a)(1)(A), and on McNamara v. Commissioner (McNamara II), 236 F.3d 410 (8th Cir. 2000), rev'g T.C. Memo. 1999-333, and rev'g Hennen v. Commissioner, T.C. Memo. 1999-306, and rev'g Bot v. Commissioner, T.C. Memo. 1999-256, where the U.S. Court of Appeals for the Eighth Circuit reversed this Court on the grounds that there was no nexus between the rental agreement and any arrangement requiring the taxpayers' material participation.[10]

The McNamaras owned and operated their farm as a joint venture for a time until they incorporated the farm under the name McNamara Farms. McNamara I,

---

[10]The U.S. Court of Appeals for the Eighth Circuit consolidated with McNamara I two other cases: Hennen v. Commissioner, T.C. Memo. 1999-306, and Bot v. Commissioner, T.C. Memo. 1999-256. Although this Court's discussion is generally directed towards the McNamara cases, the analysis and conclusions also apply to both Bot and Hennen.

slip op. at 2. Pursuant to a written lease, McNamara Farms paid the McNamaras a varying amount of rent each year; the land was used to produce agricultural commodities. Id., slip op. at 2-3. The McNamaras entered into employment agreements with McNamara Farms. Id. at 3. Mr. McNamara would serve as general manager, responsible for field work, marketing, security, employee management, and other usual and customary duties required by the agricultural production operation of McNamara Farms. Id. Mrs. McNamara would provide bookkeeping services, as well as prepare meals for the farm's employees, do field work, and perform such other usual and customary duties as might be delegated by the employer from time to time. Id. at 4. In essence, these agreements provided that the McNamaras would continue to perform their then-current duties. Id. at 3-4.

The McNamaras reported their rental income, but they did not report it as subject to self-employment tax. Id. at 5. The Commissioner determined that the payments were properly includible in their net earnings from self-employment under section 1402(a)(1). Id. The McNamaras contested this determination, and in McNamara I this Court held in the Commissioner's favor, looking beyond the terms of the lease to the McNamaras' obligations within the overall scheme of their farming operation. Id. at 8-9. In arriving at this conclusion, the Court took

into account all the facts and circumstances and applied a broad interpretation of

"arrangement", noting that

> where used in the Internal Revenue Code, the word "arrangement"
> refers to some general relationship or overall understanding between
> or among parties in connection with a specific activity or situation.
> Generally, it is not limited only to contractual relationships, or used in
> a way that suggests that its terms and conditions must be included in a
> single agreement, contractual or otherwise.  Congress obviously
> recognized a distinction between a contract and the broader concept
> of an "arrangement", as is evident from those sections of the Internal
> Revenue Code that make reference to both.  [Id. at 8 (quoting Mizell
> v. Commissioner, T.C. Memo. 1995-571).]

The Court found that "the arrangement between * * * [the McNamaras] and

McNamara Farms provided, or contemplated, that * * * [the McNamaras]

materially participate in the production of agricultural commodities on the

farmland." Id. at 9.  The Court further ruled that both the McNamaras had,

pursuant to that arrangement, materially participated in agricultural production and

concluded that the rental income was therefore farm rental income subject to

taxation as self-employment earnings.  See id. at 10.

The U.S. Court of Appeals for the Eighth Circuit reversed, holding that

despite the existence of a separate employment agreement requiring the taxpayers'

material participation--and despite their actual material participation--a rental

agreement may stand on its own in certain circumstances.  McNamara II, 236 F.3d

at 412-413. In arriving at this conclusion, the Court of Appeals noted the McNamaras' uncontradicted testimony that the rents in question were consistent with market rates for agricultural land and held that "[r]ents that are consistent with market rates very strongly suggest that the rental arrangement stands on its own as an independent transaction and cannot be said to be part of an 'arrangement' for participation in agricultural production." Id. at 413. The case was remanded to provide the Commissioner an opportunity to prove that there existed "a nexus between the rents received by * * * [the McNamaras] and the 'arrangement' that requires the landlords' material participation." Id.

On remand, the McNamaras and the Commissioner submitted supplemental briefing. After careful consideration, an order and decision was entered, finding that the rents in question were at or below fair market value and, accordingly, there were no deficiencies in the McNamaras' Federal income tax for the years in issue. McNamara v. Commissioner, T.C. Dkt. No. 7537-98 (July 10, 2002).[11]

Respondent has not argued that the instant case is distinguishable from McNamara I. Instead, his argument is based solely upon this Court's following its

---

[11]Substantially similar orders were entered in Bot v. Commissioner, T.C. Dkt. No. 7970-98 (July 10, 2002), and Hennen v. Commissioner, T.C. Dkt. No. 7535-98 (July 10, 2002).

earlier analysis and holdings in McNamara I, Bot, and Hennen.[12]  Petitioners, however, argue that McNamara II was correctly decided and urge this Court to adopt the approach used by the Court of Appeals in analyzing their situation.

Upon reconsideration of this Court's opinion in McNamara I, and its reversal by the Court of Appeals, this Court concludes that it did not give sufficient consideration to the requirement of section 1402(a)(1) that the rent in question be "derived under" an arrangement requiring the landlord's material participation.  In other words, there was insufficient consideration given to the "nexus between the rents received by [the] taxpayers and the 'arrangement' that requires the landlords' material participation."  McNamara II, 236 F.3d at 413. This issue will be reviewed accordingly in the context of the instant case.  And the parties' contentions will be examined, taking into account the burden of proof,

---

[12]This Court has twice followed the Court of Appeals' decision in McNamara II.  See Johnson v. Commissioner, T.C. Memo. 2004-56 (applying the nexus test and finding that the rent in question was not subject to self-employment tax); Solvie v. Commissioner, T.C. Memo. 2004-55 (applying the nexus test and finding that the rent in question was subject to self-employment tax).  Each of these cases, however, was properly appealable in the Eighth Circuit; thus, in following McNamara II, the Court cited Golsen v. Commissioner, 54 T.C. 742, 757 (1970) (holding that this Court would follow a Court of Appeals opinion which is squarely on point where appeal from the decision would lie to that Court of Appeals and that court alone), aff'd, 445 F.2d 985 (10th Cir. 1971).  The instant case, however, is properly appealable to the U.S. Court of Appeals for the Fifth Circuit; this Court is therefore not bound by McNamara II and may decide whether to follow the analysis of the U.S. Court of Appeals for the Eighth Circuit.

which rests upon petitioners.  See Rule 142(a).  Petitioners do not contend--nor does the Court find--that the burden of proof shifts to respondent under section 7491 as to any issue of fact.  Respondent's determinations are presumed to be correct; petitioners must prove them erroneous in order to rebut the presumption and satisfy their burden of proof.  See id.; Welch v. Helvering, 290 U.S. 111, 115 (1933).

II.     Social Security and Self-Employment

In reexamining this Court's earlier analysis, it is best to understand the intent behind section 1402(a)(1).  To do so, it is helpful to examine the history of the Social Security provisions in title 42 of the United States Code, which have identical counterparts in title 26.  These sets of statutes are often viewed in pari materia, see, e.g., Ramsay v. Commissioner, T.C. Memo. 1983-590, and should be construed to promote "a symmetrical parallel between the social security eligibility provisions for self-employed persons and the corresponding income tax provisions for taxing self-employed persons for social security purposes".  Johnson v. Commissioner, 60 T.C. 829, 833 (1973).

Self-employed individuals were first brought under the Old Age and Survivors Insurance Program (Program) in 1950.  Social Security Act Amendments of 1950 (SSA 1950), ch. 809, sec. 104(a), 64 Stat. at 502 (adding

what is presently 42 U.S.C. sec. 411(a)); id. sec. 208(a), 64 Stat. at 541 (adding

what is presently section 1402(a)). In doing so, Congress deemed these

individuals entitled to benefits and the incidence of the self-employment tax

"based upon the receipt of income from labor, which old age, death, or disability

would interrupt; and not upon the receipt of income from the investment of capital,

which these events would presumably not affect." Delno v. Celebrezze, 347 F.2d

159, 161 (9th Cir. 1965). Self-employed farmers, however, were excluded from

coverage (and self-employment taxation). This exclusion was accomplished by

excepting from "net earnings from self-employment" income derived by a self-

employed individual from a business which if carried on by employees would

constitute agricultural labor. SSA 1950, secs. 104(a), 208(a).

In 1954 the exception was removed from each provision, bringing self-

employed farmers under the protection of the Program. Congress was careful,

however, to continue to exclude from net self-employment income any amounts

received as "rentals from real estate and from personal property leased with the

real estate" regardless of the method of payment. Social Security Act

Amendments of 1954, ch. 1206, secs. 101(g), 201(a), 68 Stat. at 1055, 1087.

These provisions were amended again in 1956 to broaden coverage to include

farm owners or farm tenants if there was a "material participation by the owner or

tenant in the production or the management of the production of * * * agricultural * * * commodities." Social Security Act Amendments of 1956, ch. 836, secs. 104(a), 201(e), 70 Stat. at 824, 840.

In 1960 the U.S. Court of Appeals for the Fifth Circuit in <u>Henderson v. Flemming</u>, 283 F.2d 882, 885 (5th Cir. 1960), commented on this revision, noting that

> [i]t was, to be sure, stated somewhat awkwardly by an exception to an exclusion. But we regard this as of no moment and treat it as another instance of Congressional English as Congress weaves and rips the Penelopean tax garment to meet the undulating underlying changes in legislative policy. [Citations omitted.]

In any event, the 1956 amendment was intended to bring a new and major group of individuals under the Program. <u>Id.</u> at 887.

> "Coverage of the program should be as nearly universal as is practicable. * * * Modifications would be made in the coverage requirements for farmers and farm workers to take into account the practical problems that have arisen since they were brought into the program by the 1954 amendments. Changes would be made in the provisions on insured status and benefit computations to give the newly covered groups equitable treatment as compared with those brought in earlier." Senate Calendar No. 2156, 84th Cong., 2d Sess., Rpt. 2133, p. 1. [<u>Id.</u> n.7.]

This amendment "show[ed] a benevolent intent to protect citizens whose income diminishes or is wiped away because of old age or disability, and on the other hand to exclude income which continues in spite of old age or disability such as

the fruits of someone else's labor." Celebrezze v. Miller, 333 F.2d 29, 30 (5th Cir. 1964).

Courts have accordingly interpreted this intent to be that these provisions "should be applied to exclude only payments for use of space, and, by implication, such services as are required to maintain the space in condition for occupancy." Delno, 347 F.2d at 163. However, when the tenant's payment includes compensation for substantial additional services--and when the compensation for those services constitutes a material part of the payment--the "rent" consists partially of income attributable to the performance of labor not incidental to the realization of return from passive investment. Id. In these circumstances, the entire payment is included in "net earnings from self-employment." Id.

The issue of separating return of investment from compensation for services performed has long been identified. In fact, most self-employed individuals receive income that is a combination of income from labor and invested capital. Congress chose not to attempt the task of separating one from the other. Instead, 42 U.S.C. sec. 411(b)(1) imposed a ceiling on the total annual net earnings from self-employment that may be included in determining eligibility for benefits. See also sec. 1402(b)(1). This ceiling served to circumvent the income distortion that

might otherwise result.  Social Security:  Hearings on H.R. 2893 Before the H.R. Comm. on Ways and Means, 81st Cong. 1362-1365 (1949).

In the early 1960s several Courts of Appeals found that material participation could be attributed to an individual through the efforts of an employee or agent.  See, e.g., Harper v. Flemming, 288 F.2d 61 (4th Cir. 1961) (holding that the activities of a bank, as agent for the owner, in management of the owner's farm, constituted "material participation" by the owner in the production and management of the farm within the Social Security Act provisions); Henderson, 283 F.2d 882 (holding that where the landowner, through her son as her agent, made a "material participation" in the production or management of production of cotton and corn, her income was self-employment income subject to tax and that she was eligible for benefits);.

These provisions were intended to afford coverage to the broadest class of individuals.  And in 1974 Congress narrowed the exclusion by broadening the exception for farm-related rental income.  See Act of Aug. 7, 1974, Pub. L. No. 93-368, sec. 10(a) and (b), 88 Stat. at 422 (adding "(as determined without regard to any activities of an agent of such owner or tenant)" after "material participation by the owner or tenant" each place it appeared in 42 U.S.C. sec. 411 and section

1402(a)(1), respectively).  It is this version of section 1402 that applies to petitioners in this case.

III.    Self-Employment Income

A taxpayer's self-employment income is subject to self-employment tax. Sec. 1401(a) and (b).  Self-employment tax is assessed and collected as part of the income tax, must be included in computing any income tax deficiency or overpayment for the applicable tax period, and must be taken into account for estimated tax purposes.  Sec. 1401; see also sec. 1.1401-1(a), Income Tax Regs. Self-employment income generally is defined as "the net earnings from self-employment derived by an individual".  Sec. 1402(b).  Section 1402(a) defines "net earnings from self-employment" as "the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business".  See also sec. 1.1402(a)-1, Income Tax Regs.  The term "derived" "necessitates a nexus between the income and the trade or business actually carried on by the taxpayer."  Bot v. Commissioner, 353 F.3d 595, 599 (8th Cir. 2003) (involving individuals with the surname Bot distinct from those in Bot v. Commissioner, T.C. Memo. 1999-256), aff'g 118 T.C. 138 (2002); Newberry v. Commissioner, 76 T.C. 441, 444 (1981).  Under this Court's interpretation of the

"nexus" standard, income must arise from some income-producing activity of the taxpayer before that income is subject to self-employment tax. Jackson v. Commissioner, 108 T.C. 130, 134 (1997).

Section 1402(a)(1) generally excludes rental real estate income from the computation of a taxpayer's net earnings from self-employment. This exclusion, however, also provides that rent derived by the owner of land is not excluded from the computation of net earnings from self-employment if the income is derived under an arrangement pursuant to which the owner is required to materially participate in the agricultural production and the owner actually materially participates. Id.

These self-employment tax provisions are construed broadly in favor of treating income as earnings from self-employment. Braddock v. Commissioner, 95 T.C. 639, 644 (1990); Hornaday v. Commissioner, 81 T.C. 830, 834 (1983); S. Rept. No. 81-1669 (1950), 1950-2 C.B. 302, 354. Similarly, the rental income exclusion in section 1402(a)(1) is to be strictly construed to prevent this exclusion from interfering with the congressional purpose of effecting maximum coverage under the Social Security umbrella. Johnson v. Commissioner, 60 T.C. at 832.

A.    Agriculturally Related Rental Income

As discussed, a taxpayer's net earnings from self-employment generally exclude rental income.  Sec. 1402(a)(1).  However, certain agriculturally related rental income is properly included in a taxpayer's net earnings from self-employment if two requirements are met.  Id.  First, the rental income must be "derived under an arrangement, between the owner or tenant and another individual".  Id.  Such an arrangement must specify that:  (1) the other individual "shall produce agricultural * * * commodities" on the rented land and (2) the owner or tenant shall materially participate in the production or management of the production of those commodities.  Id.  The second requirement is that the owner materially participate in that production or management of production.  Id.

This Court, in McNamara I, slip op. at 8-9, interpreted "arrangement" broadly, finding that although the rental and employment agreements were separate, the Court would view the taxpayers' existing obligations within the overall scheme of their farming operations.  It was this view that allowed the Court to conclude that "the arrangement between * * * [the McNamaras] and McNamara Farms provided, or contemplated, that * * * [the McNamaras] materially participate in the production of agricultural commodities on the farmland."  Id., slip op. at 9.  This result was not a novel approach; in fact, courts

have long acknowledged that the income derived by individuals who own and operate their own farms is often partially attributable to income of a rental character. See, e.g., Delno, 347 F.2d at 163; Henderson, 283 F.2d at 887-888. The potential for unfairness of section 1402(a)(1) in such situations is apparent.

The U.S. Court of Appeals for the Eighth Circuit, however, took a different approach. In McNamara II, 236 F.3d at 413, the court focused on the "derived under" requirement, finding that "the practical effect of the 'derived under' language" was to require a nexus between the rents received by a taxpayer and the "arrangement" requiring the landlord's material participation. The court noted:

> [T]he mere existence of an arrangement requiring and resulting in material participation in agricultural production does not automatically transform rents received by the landowner into self-employment income. It is only where the payment of those rents comprise part of such arrangement that such rents can be said to derive from the arrangement.
>
> Rents that are consistent with market rates very strongly suggest that the rental arrangement stands on its own as an independent transaction and cannot be said to be part of an "arrangement" for participation in agricultural production. * * *
> [Id.]

Regardless of a taxpayer's material participation, if the rental income is shown to be less than or equal to market value for rent, the income is presumed to be unrelated to any employment agreement. Id. At that point, the burden of

production shifts to the Commissioner to show a nexus between the rent and the

taxpayer's obligation to materially participate.  Such a showing would render the

lease and employment agreements part and parcel of a larger "arrangement".  Id.

The analysis of McNamara II tracks and resolves the issues arising in

separating true rental income from wage income in circumstances where farmers

receive separate payments.[13]  The test proffered by the U.S. Court of Appeals for

the Eighth Circuit does not contradict congressional intent.  Rather, it supplements

existing factors for consideration and serves to implement congressional intent,

placing farmers in the same position as their urban contemporaries.

If the rent is at or below market value and the Commissioner can show that

the rental agreement has a sufficient nexus with an agreement requiring the

taxpayer's material participation, the first prong of the section 1402(a)(1) test is

met and congressional intent is protected.[14]  If the Commissioner cannot show a

sufficient nexus, however, congressional intent is not frustrated.  Because

Congress provided an avenue by which the Court might determine the correct

---

[13]This Opinion does not endeavor to resolve the more difficult issue of separating rent and wage income in situations involving a single payment.

[14]Compare Celebrezze v. Miller, 333 F.2d 29 (5th Cir. 1964), and Henderson v. Flemming, 283 F.2d 882 (5th Cir. 1960), with Celebrezze v. Maxwell, 315 F.2d 727 (5th Cir. 1963).

amount of net self-employment income, taxpayers are afforded an opportunity to pay the correct amount of tax. This serves to place farmers in the same position as their urban contemporaries with respect to rental income that is insufficiently related to their trade or business.

Congress' intent was to afford income protection to taxpayers who might not otherwise be able to provide for themselves in old age. The provisions were designed to address wage income lost in old age--not to augment a continuing rental income stream. In those circumstances where the two agreements are truly separate and distinct, the taxpayer is not in jeopardy of losing his rental income if he is unable to materially participate. Rather, he must only hire someone else to perform those tasks that he was otherwise performing.

Because this Court finds the U.S. Court of Appeals for the Eighth Circuit's analysis and reasoning sound, the next step is to evaluate the facts of this case in the light of McNamara II.

B.     Application of McNamara II

Each of the requirements in section 1402(a)(1) operates independently. Because the parties stipulated that petitioners materially participated in the production of agricultural commodities on their farm during the years in issue, the

Court will limit its analysis to whether there existed an arrangement sufficient to subject petitioner's rental income to self-employment tax.

With respect to the statute's first requirement--that income be derived under an arrangement--section 1.1402(a)-4(b)(2), Income Tax Regs., explains:

> In order for rental income received by an owner or tenant of land to be treated as includible farm rental income, such income must be derived pursuant to a share-farming or other rental arrangement which contemplates material participation by the owner or tenant in the production or management of production of agricultural or horticultural commodities.

Such an arrangement may be oral or written, but it "must impose upon such other person the obligation to produce one or more agricultural or horticultural commodities (including * * * poultry * * *) on the land of the owner or tenant". Id. subpara. (3). The arrangement must also require material participation by the owner; in its contemplation of the owner's material participation, the arrangement may consider the sum of the participation in connection with the production or the management of the production of agricultural or horticultural commodities. Id. subparas. (1), (3). Under such circumstances, rental income is characterized as includible farm rental income and accordingly considered earnings from self-employment. Id. subpara. (1).

Irrespective of a taxpayer's material participation--actual, required, or otherwise[15]--the taxpayer may establish that the rental agreement stands on its own, unrelated to the taxpayer's farming activity. McNamara II, 236 F.3d at 413. If the rental income received was at or below market value, the burden of production then shifts to the Commissioner to show a nexus between the rent and the agricultural arrangement requiring the taxpayer to materially participate. Id. Such a showing would render the lease and employment agreements part and parcel of a larger "arrangement". Id.; see also Johnson v. Commissioner, T.C. Memo. 2004-56 (following McNamara II and finding an insufficient nexus); Solvie v. Commissioner, T.C. Memo. 2004-55 (same but finding a sufficient nexus).

As shown by the evidence, the rent payments petitioners received represented fair market rent and were consistent with amounts paid by other Sanderson Farms growers for the use of similar premises. This is sufficient under

[15]Because the Court finds that the rental income is not includible in petitioners' net self-employment income because it was consistent with fair market rent and because respondent did not show a nexus between the rent and the arrangement requiring petitioners' material participation, there is no need to address petitioners' alternative contention that none of the agreements or contracts actually required their material participation.

McNamara II to establish that the agreement stands on its own, but the Court finds that additional facts further support the Court's conclusion.

Petitioners invested a significant amount of money--over $1.2 million--in the eight 22,000-square-foot broiler houses and other improvements, which were all built according to the exacting specifications of Sanderson Farms. And although the rental agreement covered petitioners' farm (excluding their residence, access to the residence, and 10 acres), structures, 176,000 square feet of poultry houses, and equipment, CL Farms used approximately 10 acres and these single-use structures for purposes of the BPA. Practically speaking, this agreement functions as a return on investment rather than a method of income recharacterization.

As part of their agricultural appraisal, petitioners obtained a detailed analysis of the costs of operating their farm purely as an investment. Petitioners, in turn, priced CL Farms' activities, including labor and management costs, to exceed the appraisal's projected costs. These amounts were not merely remainder payments to petitioners after the rent checks were cashed. They were appropriate amounts for CL Farms to spend for the services required to operate its broiler

houses as well as its grazing and other agricultural activities.[16]  The structuring of these expenses further illustrates the lengths to which petitioners went to operate CL Farms as a legitimate business and not as a method to avoid self-employment tax.

These facts--supported by petitioners' testimony, documentation, and briefing--provide strong evidence that the rental agreement should stand on its own.  Thus, the burden of production shifts to respondent to show a nexus between the rents and the agricultural arrangement requiring petitioners' material participation.

This Court has previously evaluated the nexus between the rental income and the taxpayer's production arrangement.  See, e.g., Bot v. Commissioner, 118 T.C. 138 (finding value-added payments reported as rental income includible in net self-employment income where the payments were directly related to the volume of corn acquired and delivered by taxpayers); Solvie v. Commissioner, T.C. Memo. 2004-55 (same when rent payments were tied directly to the number of pigs raised).  But see Johnson v. Commissioner, T.C. Memo. 2004-56 (finding an insufficient nexus).  But despite petitioners' presentation and the Court's

---

[16]Although the lease payments were structured to follow each flock, CL Farms earned only 88.5% of its annual income through the BPA.  Neither party addressed CL Farms' other agricultural activity, so it will not be discussed further.

previous application of the well-reasoned nexus requirement in <u>Solvie</u> and <u>Johnson</u>, respondent did not brief this issue.

Instead, respondent puts all of his proverbial eggs in the <u>McNamara I</u> basket, noting in his brief the Commissioner's nonacquiescence in the Court of Appeals' decision, citing AOD 2003-03, 2003-2 C.B. xxiii, and arguing for the Court to interpret "arrangement" broadly to include any and all contracts related to CL Farms.

Without alternative, this Court must conclude that the rental agreement is separate and distinct from petitioners' employment obligations and, therefore, the rental income is not includible in their net self-employment income.

IV.   <u>Conclusion</u>

Using the <u>McNamara II</u> analysis, the Court finds that petitioners' agriculture-related rental income is not included in their net self-employment income under section 1402(a)(1).  Petitioners have shown that the rent payments were at or below market value, and respondent failed to show--and the record does not contain sufficient evidence showing--a nexus between the rents and the agricultural arrangement requiring petitioners' material participation.

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.

Reviewed by the Court.

MARVEL, FOLEY, VASQUEZ, GALE, THORNTON, GOEKE, HOLMES, MORRISON, KERRIGAN, BUCH, and PUGH, <u>JJ</u>., agree with this opinion of the Court.

GUSTAFSON, J., dissenting:  The outcome determined in the opinion of the Court is attractive, but its reasoning is based on a fair-market safe harbor that is not warranted by the actual text of section 1402(a)(1) as enacted by Congress; and for that reason I join Judge Nega's dissent.  I write separately to criticize the resulting evidentiary regime that the majority creates ex nihilo.

The majority adopts the holding of McNamara v. Commissioner, 236 F.3d 410 (8th Cir. 2000), see op. Ct. pp. 27-28, which it interprets as follows, see op. Ct. pp. 23-24:

> Regardless of a taxpayer's material participation, if the rental income is shown to be less than or equal to market value for rent, the income is presumed to be unrelated to any employment agreement. * * * At that point, the burden of production shifts to the Commissioner to show a nexus between the rent and the taxpayer's obligation to materially participate.  * * *  [Emphasis added.]

In fact, the McNamara opinion says nothing about any "presum[ption]" nor about the "burden of production" or any shift therein.  Rather, this regime is newly announced today by the Tax Court, and it is not warranted.

Where an agreement calls for rent payments that exceed what the market would actually bear, that excess is evidence that things may not be what they seem, and may be evidence that there is an arrangement in which compensation for labor is being disguised as rent, so that self-employment tax may be improperly

avoided. On the other hand, where an agreement calls for rent payments at fair market value (so that, as an economic matter, the rental agreement might plausibly stand on its own),[1] I assume, along with the majority, that the fair-market rent is evidence that the arrangement may not involve disguised compensation for labor. That is, the fact of fair-market rent may be relevant to the question of whether, for purposes of section 1402(a)(1), there is no arrangement linking rent and labor.

But relevancy should not be equated with sufficiency. It is entirely possible (as the opinion of the Court effectively admits, by inviting the IRS to offer counter-evidence) that, notwithstanding the ostensibly reasonable rent, a fair-market rental agreement could be part of an "arrangement" under which the rental agreement is contingent on (and is therefore linked to) an agreement providing compensation for labor. Given that possibility, there is nothing in the statute, in logic, in custom, or in common experience that makes the absence of an

_____

[1]The opinion of the Court indiscriminately refers to rent "at or below market value" (emphasis added); but rent below market value implicates other questions. If rent is being underpaid, is the recipient seeking to maximize his Social Security benefits by inflating his compensation for labor? Or is the bargain rent an inducement to the payor to hire the recipient to perform labor for which he might otherwise not be hired (clearly an "arrangement" under section 1402(a)(1))? I believe the majority is plainly wrong if, as it appears, it holds, see op. Ct. pp. 27-28 that where "the rental income received was at or below market value," it should be presumed that the taxpayer has "establish[ed] that the rental agreement stands on its own". (Emphasis added.) On the contrary, proof that rent is set at a rate below market value indicates that the rental agreement does not stand on its own.

arrangement so probable that, on the taxpayer's mere showing of a fair-market rent, we necessarily relieve him of the burden of producing additional evidence of such absence unless the Commissioner can come forward with <u>some</u> evidence that there <u>is</u> an arrangement--but that is the nature of an evidentiary presumption, and the opinion of the Court gives no reason for it.

To show the absence of an "arrangement", the reasonableness of the rent is only one of the pieces of evidence that a taxpayer might present, along with, for instance, his own or the tenant's testimony that there is no arrangement. There is no reason to select the reasonableness of the rent as a special fact that somehow gives rise to a presumption and shifts the burden of production.

ASHFORD, <u>J</u>., agrees with this dissent.

NEGA, J., dissenting:  The opinion of the Court chooses to apply the Court of Appeals for the Eighth Circuit's reasoning in McNamara II outside the Eighth Circuit.  I believe that the plain reading of the statute is inconsistent with the Court of Appeals' reading.  Consequently, I would not extend its reading to the instant case.

The relevant Internal Revenue Code provision is section 1402(a)(1).  For the determination of net earnings from self-employment (which are generally subject to self-employment tax), this section provides an exclusion for "rentals from real estate and from personal property leased with the real estate * * * together with the deductions attributable thereto, unless such rentals are received in the course of a trade or business as a real estate dealer".  However, this exclusion, by its terms,

> shall not apply to any income derived by the owner or tenant of land if (A) such income is derived under an arrangement, between the owner or tenant and another individual, which provides that such other individual shall produce agricultural or horticultural com- modities (including livestock, bees, poultry, and fur-bearing animals and wildlife) on such land, and that there shall be material participa- tion by the owner or tenant (as determined without regard to any activities of an agent of such owner or tenant) in the production or the management of the production of such agricultural or horticultural commodities, and (B) there is material participation by the owner or tenant (as determined without regard to any activities of an agent of such owner or tenant) with respect to any such agricultural or horticultural commodity * * *  [Id.]

On its face the statute does not provide a special rule for "at or below fair market rents". Had Congress wanted to provide such a special rule, I see no reason for its absence from the current statute.

Focusing only on the plain wording of the Code, I do not believe that the Court of Appeals' interpretation is the best reading. Under our caselaw, I would still treat McNamara II as binding in the circuit in which it was decided. See Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971). I would not, however, expand its application beyond the Eighth Circuit.

In McNamara II, 236 F.3d at 413, the Court of Appeals faulted the Tax Court's opinion for failing to take into account the "nexus between the rents received by Taxpayers and the 'arrangement' that requires the landlords' material participation." The Court of Appeals focused on the two words "derived under" in the statute to enunciate a new standard, stating that

> the mere existence of an arrangement requiring and resulting in material participation in agricultural production does not automatically transform rents received by the landowner into self-employment income. It is only where the payment of those rents comprise part of such an arrangement that such rents can be said to derive from the arrangement.
>
> Rents that are consistent with market rates very strongly suggest that the rental arrangement stands on its own as an independent transaction and cannot be said to be part of an "arrangement" for participation in agricultural production. Although the Commissioner

is correct that, unlike other provisions in the Code, § 1402(a)(1) contains no explicit safe-harbor provision for fair market value transactions, we conclude that this is the practical effect of the "derived under" language.

[Id.]

I think that the words "derived under" are too slender a reed to support such a construction of the tax law. I believe the better reading of the statute is that the entire arrangement is what determines the tax consequences for self-employment purposes. In that regard I would endorse the jurisprudence in Mizell v. Commissioner, T.C. Memo. 1995-571. Section 1402(a) provides a comprehensive structure for defining "net earnings from self-employment." We must not forget that there can be other streams of income besides "rents" in many single transactions to which the other paragraphs of section 1402(a) must be applied to reach an accurate determination of an individual's "net earnings from self-employment." A better reading of section 1402(a)(1), including the words "derived under", is that the arrangement as a whole must be the focus instead of what the parties define as falling within two or more income streams (in this case payments for personal services and for the use of real estate and personal property). I will have more to say below about the hazards of relying on the parties to a contract for purposes of characterizing amounts eligible for an

exception from self-employment tax, when only one of those parties will have self-employment tax liability.

While we will never know exactly what Congress intended in regard to this provision, it is entirely plausible that Congress declined to include such a safe harbor because it had concerns about the practical limitations of a "market rate rental" exception from self-employment tax. All taxpayers have an interest in legally seeking to maximize their after-tax profits. Surely that would include self-employment tax costs once enough such tax had been paid to ensure coverage for the taxable year under Social Security. The facts of this case clearly illustrate that a single transaction between a taxpayer and another individual may result in multiple types of income. In this case the contract anticipates at least personal service income and income paid for the use of real estate and personal property. Not readily apparent in the facts of the instant case, but often involved in other transactions involving the determination of net earnings from self-employment, are other types of income such as dividends, interest, and capital gains.

There are examples too numerous to count where the existence of a tax-indifferent party leads to an agreement between two parties to mischaracterize a transaction to provide an unjustified tax result for the non-tax-indifferent party. For example, if Sanderson Farms gets the same tax outcome for its payments

under a contract with a producer (e.g., petitioners) regardless of the proportion of contract payments subject to self-employment tax to the producer, then Sanderson Farms may not have any reason to dispute the producer's characterization of the amount of the contract payments for which the producer is subject to self-employment tax. Further, if Sanderson Farms' competitors were also tax indifferent and agreed to such a favorable characterization, then Sanderson Farms might be competitively disadvantaged if it did not follow suit. Indeed, both parties to such an arrangement could share in any tax reduction resulting from the mischaracterization of an amount by slightly reducing the overall contract price under the arrangement.

While the record in the instant case does not readily provide an answer to the question whether this transaction had a tax-indifferent party as to petitioner's self-employment tax liability, that is unimportant. What is important is whether one believes that concerns such as this could have led Congress to decline to provide a safe harbor for "at or below market rents" under section 1402(a)(1). Again, I am not aware of legislative history either for or against such a notion. I would only say that such a concern is compelling justification for the absence of such a statutory safe harbor and is a compelling argument against the judicially imposed safe harbor under McNamara II.

GUSTAFSON, LAUBER, and ASHFORD, <u>JJ</u>., agree with this dissent.